IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____ FILED    _____ ENTERED
_____ LOGGED   _____ RECEIVED

JUN – 5 2026

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

IN THE MATTER OF THE SEIZURE OF THE
EQUIVALENT AMOUNT OF USDT TOKENS
AS ASSOCIATED WITH 8
CRYPTOCURRENCY WALLET ADDRESSES:

TXfcBgRLR3KSXU3EKx7cqTd1hiQmApZJds
TFsoKXzYRSL1rdiQKEr5M3FYCzVKK5VR7N
TL7SATJ7dNqZyYCzhCneEfqBENPsSDcd7c
TGccjccLh2dkpJy2TpwFH7KbSKe4PyxhTS
TD4j3yetUk3tLhnqACgbuGXoQGHngcU2Q3
TStxBD56uUSmsJ5jrwoFVDUMN5Kgy8s25t
TT7KZZtsBSdcchLW2KnnGLnr9wZAAbc98U
TQTVRmLE6KakX2rNe6mt294pL1tCjLVui2

Case No. _8:26-mj-01283-AAQ_

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEIZURE WARRANT**

I, William Novak, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Washington Field Office, Northern Virginia Resident Agency.  I have been employed by the FBI since 2014.  I am currently assigned to a squad which has investigative responsibility for fraud-based and other economic crimes.  I have participated in numerous criminal investigations to include violations related to corporate fraud, securities fraud, mail fraud, wire fraud, money laundering, and obstruction of justice.  Prior to joining the FBI, I previously worked as an attorney and Certified Public Accountant for large accounting and law firms.

3.      As a federal agent, I am authorized to investigate violations of laws of the United States.  As a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      As further described below, this affidavit is made in support of an application for a seizure warrant for funds traceable to, and involved in, a fraud scheme that deceived the victim into sending cryptocurrency payments to fraudulent platforms, for which payments were subsequently laundered into the **following addresses:**

   a.  TXfcBgRLR3KSXU3EKx7cqTd1hiQmApZJds

   b.  TFsoKXzYRSL1rdiQKEr5M3FYCzVKK5VR7N

   c.  TL7SATJ7dNqZyYCzhCneEfqBENPsSDcd7c

   d.  TGccjccLh2dkpJy2TpwFH7KbSKe4PyxhTS

   e.  TD4j3yetUk3tLhnqACgbuGXoQGHngcU2Q3

   f.  TStxBD56uUSmsJ5jrwoFVDUMN5Kgy8s25t

   g.  TT7KZZtsBSdcchLW2KnnGLnr9wZAAbc98U

   h.  TQTVRmLE6KakX2rNe6mt294pL1tCjLVui2

      (hereafter the "SUBJECT ADDRESSES")

5.      **SUBJECT ADDRESSES.**  Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that unknown subjects have violated 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to

commit wire fraud) and laundered the proceeds of that activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (concealment money laundering). There is also probable cause to believe that the **SUBJECT ADDRESSES** received the proceeds of the wire fraud scheme described below and that the equivalent amount of USDT associated with each of the SUBJECT ADDRESSES, collectively hereinafter the "TARGET PROPERTY", are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Moreover, there is probable cause to believe that the **TARGET PROPERTY** is subject to forfeiture as property involved in money laundering, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1). The particular items to be seized are further described in the following paragraphs and in Attachment A.

## APPLICABLE LAW

6.     This Court has jurisdiction to issue the requested warrants to seize the **TARGET PROPERTY** because it is proceeds of wire fraud, in violation of 18 U.S.C. § 1343, and/or involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and as such is subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a) (criminal forfeiture), and 18 U.S.C. § 981(a)(1)(A) and (C) (civil forfeiture).

7.     Title 18, United States Code, Section 1343 (wire fraud) provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," shall be guilty of a federal offense.

8.     Title 18, United States Code, Section 1956(a)(1)(B)(i) (laundering of monetary instruments with intent to conceal) provides that "[w]hoever, knowing that the property involved

in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" shall be guilty of a federal offense. Wire fraud is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1).

9. The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture. In addition, 28 U.S.C. § 2461(c) provides that "if a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain a forfeiture of property "as part of the sentence in the criminal case." Thus, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

10. Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture. In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime, which includes the actual property laundered and property used

to facilitate the laundering offense. *See United States v. McKinney*, No. 07-0113-01 (RBW), 2009 WL 10701319 at *7 (D.D.C. Mar. 26, 2009) ("property that may be used to facilitate a money laundering violation includes money in financial accounts, personal property, real property, and businesses"); *see also United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999) (explaining that untainted funds that are comingled with tainted funds derived from illicit sources may constitute a facilitating property).

11. This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could otherwise be placed beyond the Government's reach. Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement," if there is probable cause to believe that the property is subject to forfeiture. Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in any district court where any of the acts giving rise to the forfeiture occurred, even as to property located in a foreign jurisdiction. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

## BACKGROUND REGARDING VIRTUAL CURRENCY

12. **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual

currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

13. **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

14. **Virtual Currency Wallet:** A virtual currency wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. Multiple addresses can be stored in a wallet.

15. **Blockchain:** Many virtual currencies publicly record their transactions on what is referred to as the "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable and historical record of every transaction that has ever occurred utilizing that blockchain's specific technology. The blockchain can be updated multiple times per hour and records every virtual currency address that ever received that virtual

currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

16. **Blockchain Analysis:** Although the identity of an address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular address. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity. A user of virtual currency can utilize multiple addresses at any given time and there is no limit to the number of addresses any one user can utilize.

17. **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

18. **Tether (USDT):** Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

## BACKGROUND ON INVESTIGATION

19. This investigation involves a fraud scheme that is being perpetrated by a sophisticated scam call center that is targeting U.S.-based victims with Indian heritage. The perpetrators use a variety of schemes to trick or coerce victims, many of whom are elderly, into providing money to the perpetrators.

20. Initial contact with victims is typically made via a phone call by someone pretending to work at the Indian Consulate in San Francisco, California. The victim is advised that their identity, either through a passport or phone number or some other identifier, is

associated with serious criminal activity in India. The victim is then transferred to other conspirators who pretend to be associated with Indian law enforcement, to include India's Central Bureau of Investigation and Delhi Police.

21.     The scammers create a sense of urgency and panic by informing victims that they are facing serious legal problems that must be addressed immediately and failure to respond may result in arrest or significant financial penalties. The scammers may threaten the victim with arrest in the United States and extradition to India if they fail to cooperate. The scammers may inform the victim that the FBI is assisting with their investigation. Furthermore, the scammers typically insist that victims consent to constant surveillance, usually via WhatsApp or Microsoft Teams video calls, which can last for several weeks.

22.     Regardless of which specific technique is used, the perpetrators almost invariably instruct the victims that, in order to prevent dire consequences, the victims must cooperate with the "investigation" by transferring money – via wire transfer, cash, or gold – to some supposed government entity. The victims are typically told that their money will be returned at the conclusion of the "investigation" once cleared of any wrongdoing.

23.     In recent years, the perpetrators have also often begun instructing victims to send these payments via cryptocurrency. Due to the fact that many of the victims in these cases are elderly and do not have, or know how to obtain, cryptocurrency, the perpetrators frequently tell the victims to withdraw cash from their bank accounts, travel to a nearby Cryptocurrency ATM, deposit the cash there, and initiate a transaction to an address provided to the victim by the perpetrator.

## PROBABLE CAUSE FOR SEIZURE OF TARGET PROPERTY

24.     On or about April 15, 2026, Victim-1, a 41-year-old male residing in Montgomery Village, Maryland, submitted a complaint to the FBI's Internet Crime Complaint Center.  Victim-1 described being victimized by the same Indian government impersonation scam (described above) that has targeted numerous victims in the United States.  Your affiant contacted Victim-1 on or about April 16, 2026, and interviewed Victim-1 at the FBI Washington Field Office on or about April 20, 2026.

25.     According to Victim-1, he was contacted by an individual claiming to work at the Indian Consulate in San Francisco.  Victim-1 was told a phone number associated with Victim-1 was making fraudulent calls in India, and Victim-1 was instructed to speak with Delhi Police immediately.  Vicitm-1 was then transferred to an individual who claimed to work for the Delhi Police.

26.     The scammers purporting to work for Delhi Police proceeded to threaten Vicitm-1 with arrest and extradition if he did not cooperate with their investigation.  Over a period of multiple weeks, Victim-1 proceeded to sell his investment portfolios so that Indian law enforcement could conduct a "forensic analysis" of the funds.  In order to conduct this analysis, Victim-1 was told to transfer all funds to the "Strike App," where Victim-1 purchased Bitcoin (BTC) at the direction of the scammers.

### SUMMARY OF THE MOVEMENT OF FUNDS FROM VICTIM-1

27.     Between on or about March 17, 2026, and on or about April 2, 2026, Victim-1 conducted five transactions using the BTC purchased through the account he created at Strike, at the direction of the scammers.  Each of these transactions were sent to a BTC address provided to Victim-1 by the scammers,

bc1p9ns5fcqd8krv48n7c89j9s20wnl9k0xjzplsawpf7z5trpf5zyds5gg5r3 (bc1p9). Prior to these transfers, bc1p9 had not sent or received any cryptocurrency. Further, at the time of this writing, the only cryptocurrency bc1p9 has ever received is the BTC it received as a result of these five transfers. A table showing the details of each transfer is below:

| Date | Receiving Address | Amount | Amount USD | BTC Balance |
|---|---|---|---|---|
| 2026-03-17 21:54:39Z | bc1p9 | 0.36 | 26685.57 | 0.36 |
| 2026-03-19 00:36:16Z | bc1p9 | 0.2 | 14038.92136 | 0.56 |
| 2026-03-20 00:44:34Z | bc1p9 | 0.2 | 14153.48105 | 0.76 |
| 2026-03-27 22:51:13Z | bc1p9 | 0.93 | 61402.35409 | 1.69 |
| 2026-04-02 17:38:04Z | bc1p9 | 2.9496608 | 197629.6628 | 4.63966076 |

28.    The above BTC was held in bc1p9 until on or about April 11, 2026. Between on or about April 11, 2026, and on or about April 14, 2026, the entire contents of bc1p9 were withdrawn and sent to five different BTC addresses associated with HiFi Swap, a swapping and bridging service[1], over the course of five transfers. A table of these transfers is below:

| Date | Receiving Address | Amount | Amount USD | BTC Balance |
|---|---|---|---|---|
| 2026-04-11 06:38:37Z | HiFi Swap | -1 | 73376.92075 | 2.63965388 |
| 2026-04-11 06:38:37Z | HiFi Swap | -1 | 73376.92075 | 3.6396579 |
| 2026-04-13 15:42:44Z | HiFi Swap | -1 | 74650.5595 | 1.63965245 |
| 2026-04-13 16:33:21Z | HiFi Swap | -1 | 74650.5595 | 0.63964843 |
| 2026-04-14 01:16:21Z | HiFi Swap | -0.63964383 | 47380.7348 | 0 |

29.    As a result of these transactions, the funds traceable to Victim-1 held in bc1p9 were converted from BTC to Tether (USDT) on the Tron (TRX) Blockchain. Of the five above-described transfers, three were sent to address TBbyn6UVtBqAfFVEieWa8xHGuohEmaSaUJ

---

[1] Bridging, or Chain Hopping, as it relates to cryptocurrency, describes the movement of cryptocurrency from one blockchain to another. Bitcoin on the bitcoin blockchain, for example can only be sent to other bitcoin blockchain addresses. If an individual wants to send the Bitcoin to a different blockchain, the bitcoin must be sent to a service that allows the Bitcoin to be exchanged for a different type of cryptocurrency that is compatible with the blockchain of choice.

(TByn) and two were sent to address TV8kBEGKyEYKQm7tYxu9KYnGV4uNpSDTmC

(TV8k). A table of the corresponding swap transactions can be viewed below:

| Date | Receiving Address | Amount | Amount USD |
|---|---|---|---|
| 2026-04-11 06:38:37Z | HiFi Swap | -1 | 73376.92075 |
| 2026-04-11 06:58:36Z | TBby | 72457.43205 | 72477.23618 |
| 2026-04-11 06:38:37Z | HiFi Swap | -1 | 73376.92075 |
| 2026-04-11 06:59:03Z | TV8k | 72441.73962 | 72461.53947 |
| 2026-04-13 16:33:21Z | HiFi Swap | -1 | 74650.5595 |
| 2026-04-13 16:54:54Z | TV8k | 71761.72223 | 71793.07385 |
| 2026-04-13 15:42:44Z | HiFi Swap | -1 | 74650.5595 |
| 2026-04-13 16:43:18Z | TBby | 71941.55844 | 71972.98862 |
| 2026-04-14 01:16:21Z | HiFi Swap | -0.63964383 | 47380.7348 |
| 2026-04-14 02:10:21Z | TBby | 47412.9018 | 47431.16663 |

30. The government has employed the lowest intermediate balance rule ("LIBR") in tracing the cryptocurrency in the **SUBJECT ADDRESSES**. Under the LIBR, when criminal proceeds are commingled with legitimate or unknown-origin funds in an account, there is a presumption that legitimate funds are withdrawn first, leaving the criminal proceeds in the account. Under the presumption, criminal proceeds remain in the account as long as the account balance is equal to or greater than the amount of criminal proceeds deposited. *See Sony Corporation of America v. Bank One, West Virginia, Huntington, NA*, 85 F. 3d 131 (4th Cir. 1996). However, that does not mean that the LIBR requires that the proceeds are always spent last. *See United States v. Miller*, 911 F.3d 229, 234 (4th Cir. 2018). "In other words, the LIBR circumscribes what can be traced into an account, rather than out of it." *Id.* at 235. The Fourth Circuit described the LIBR in *Miller* as follows:

> The LIBR provides that where the balance of an account into which tainted proceeds are deposited subsequently dips below the amount of those tainted proceeds, the only tainted funds thereafter traceable to the account are funds equal to that lowest account balance. This is true even if the account balance later grows through the deposit of legitimate funds. Assume, for example, that

> a money launderer deposits $50,000 of laundered proceeds into an account with a balance of $100,000, yielding a new balance of $150,000. The launderer then spends $120,000 and buys, inter alia, a $20,000 car, leaving the account with only a $30,000 balance. The LIBR precludes ascribing more than $30,000 in laundered proceeds to that bank account thereafter, even if the balance of the account subsequently rises above $50,000 through the deposit of legitimate proceeds. However, it permits tracing $20,000 to the car that the money launderer purchased with tainted funds.

*Id.* at 234 (4th Cir. 2018).

31.    A LIBR analysis of TBby and TV8k shows that the funds TBby and TV8k received from bc1p9 were then sent from these addresses to a consolidation address, TBgMAx7Tn3rP74GB4rAyFA1rH7oiRFH8PH (TBgM), over the course of four transfers between on or about April 12, 2026, and on or about April 14, 2026.

32.    TBgM was first activated on or about April 1, 2026. Since then, through about April 20, 2026, TBgM has conducted approximately 656 transfers of USDT, in which TBgM received a total of approximately 2,620,993.887929 USDT and sent approximately 2,620,993.678 USDT, rarely holding a significant balance of USDT during this time.

33.    In your affiant's training and experience, the high transaction volume of TBgM, combined with nearly identical value of deposits and withdrawals, is highly indicative of TBgM being used as a consolidation wallet to launder cryptocurrency. The FBI further analyzed TBgM's transactions using LIBR to trace the commingled funds held within TBgM to determine their eventual location. As a result of the LIBR analysis, the FBI identified eight withdrawals from TBgM containing funds traceable to or involved in the laundering of funds traceable to Victim-1.

34.    A total of eight withdrawals from TBgM containing funds traceable to or involved in the laundering of funds traceable to Victim-1 were sent to eight different Tron addresses:

*Subject Address 1*

35.    On or about April 13, 2026, at around 1:19 AM, TBgM sent approximately 10,100 USDT to TKHyveGubmhvBaVekpJPwGsJF4SMg8RyTK (TKHy).  Prior to this transaction, TKHy held a balance of approximately 10,198.945 USDT, which, following the above-described deposit, grew to 20,298.945 USDT.  Hours later, TKHy transferred approximately 11,056 USDT to TXfcBgRLR3KSXU3EKx7cqTd1hiQmApZJds (SUBJECT ADDRESS 1).  Prior to this, SUBJECT ADDRESS 1 held a balance of about 8,448 USDT, which grew to 19,504 USDT following the above-described deposit.  At the time of this writing, SUBJECT ADDRESS 1 has not received additional USDT since this transaction.

*Subject Address 2*

36.    On or about April 14, 2026, at around 1:22 AM, TBgM transferred approximately 39,008 USDT to TFsoKXzYRSL1rdiQKEr5M3FYCzVKK5VR7N (SUBJECT ADDRESS 2).  Prior to this transfer, SUBJECT ADDRESS 2 held a balance of approximately 2,398.63105 USDT, which grew to approximately 41,406.63105 USDT following the above-described deposit.

37.    Following this transfer, SUBJECT ADDRESS 2 conducted two transfers, withdrawing 650 USDT to an unrelated address on or about April 14, 2026, and receiving 100 USDT from an unrelated address on or about April 15, 2026, leaving SUBJECT ADDRESS 2 with a balance of approximately 40,856.63105 USDT.

*Subject Address 3*

38.    On or about April 14, 2026, at around 1:23 AM, TBgM transferred approximately 38,848 USDT to TVf43mwj5iGu9KSXt9yRaiuiasGz7xD8Vo (TVf4).  Prior to this, TVf4 held a USDT balance of 0.05 USDT, which rose to 38,848.05 USDT following the above-described

deposit.  Approximately one minute later, TVf4 transferred approximately 38,844.551792 USDT to TL7SATJ7dNqZyYCzhCneEfqBENPsSDcd7c (SUBJECT ADDRESS 3).

39.    Prior to this transfer, SUBJECT ADDRESS 3 held a balance of approximately 4,147.666555 USDT, which grew to approximately 42,992.218347 following the above-described deposit.  Since this deposit, SUBJECT ADDRESS 3 conducted one additional transfer of USDT, in which it sent about 980 USDT back to TVf4, leaving SUBJECT ADDRESS 3 with a balance of about 42,012.218347 USDT.

*Subject Address 4*

40.    On or about April 14, 2026, at around 1:31 AM, TBgM transferred approximately 26,925 USDT to TGccjccLh2dkpJy2TpwFH7KbSKe4PyxhTS (SUBEJCT ADDRESS 4).  Prior to this, SUBJECT ADDRESS 4 held a balance of approximately 158.354623 USDT, which grew to 27,083.354623 USDT following the above-described transfer.

41.    Since this deposit, SUBJECT ADDRESS 4 received two additional deposits of unrelated USDT, totaling about 441 USDT, and conducted four withdrawals of USDT, totaling about 19,350 USDT, leaving SUBJECT ADDRESS 4 with a balance of approximately 8,174.354623 USDT.

*Subject Address 5*

42.    On or about April 14, 2026, at around 1:33 AM, TBgM transferred approximately 36,542 USDT to TD4j3yetUk3tLhnqACgbuGXoQGHngcU2Q3 (SUBEJCT ADDRESS 5).  Prior to this, SUBJECT ADDRESS 5 held a balance of approximately 66.874822 USDT, which grew to 36,608.874822 USDT following the above-described transfer.

43.     Since this deposit, SUBJECT ADDRESS 5 received one additional unrelated deposit of 5,000 USDT, and conducted 14 withdrawals of USDT, totaling about 12,089.3 USDT, leaving SUBJECT ADDRESS 4 with a balance of approximately 29,519.574822 USDT.

*Subject Address 6*

44.     On or about April 14, 2026, at around 1:52 AM, TBgM transferred approximately 43,177 USDT to TStxBD56uUSmsJ5jrwoFVDUMN5Kgy8s25t (SUBEJCT ADDRESS 6). Prior to this, SUBJECT ADDRESS 6 held a balance of approximately 34,701.89865 USDT, which grew to 77,878.89865 USDT following the above-described transfer.

45.     Since this deposit, SUBJECT ADDRESS received no additional deposits of USDT, but conducted 7 withdrawals of USDT, totaling about 57,673 USDT, leaving SUBJECT ADDRESS 6 with a balance of approximately 20,205.89865 USDT.

*Subject Address 7*

46.     On or about April 14, 2026, at around 2:33 AM, TBgM transferred approximately 24,764 USDT to TT7KZZtsBSdcchLW2KnnGLnr9wZAAbc98U (SUBEJCT ADDRESS 7). Prior to this, SUBJECT ADDRESS 7 held a balance of approximately 0.023709 USDT, which grew to 24,764.023709 USDT following the above-described transfer.

47.     Since this deposit, SUBJECT ADDRESS received two additional deposits of USDT, totaling 19.5 USDT, and conducted two withdrawals of USDT, totaling about 14.496591 USDT, leaving SUBJECT ADDRESS 6 with a balance of approximately 25,768.027118 USDT.

*Subject Address 8*

48.     On or about April 14, 2026, at around 2:44 AM, TBgM transferred approximately 17,385 USDT to TQTVRmLE6KakX2rNe6mt294pL1tCjLVui2 (SUBEJCT ADDRESS 8).

Prior to this, SUBJECT ADDRESS 7 held a balance of approximately 128.197731 USDT, which grew to 17,513.197731 USDT following the above-described transfer.

49.     Since this deposit, SUBJECT ADDRESS received no additional deposits of USDT, but conducted 10 withdrawals of USDT, totaling about 6,457.854878 USDT, leaving SUBJECT ADDRESS 6 with a balance of approximately 11,055.342853 USDT.

50.     Based on my training and experience, and consultation with subject matter, I know the above flow of funds is indicative of money laundering. At each stage above, various methods commonly used by individuals laundering money were used to thwart law enforcement's ability to trace, and ultimately recover, any illicit proceeds.

51.     Further, although your Affiant was unable to trace all of the funds located in the **SUBJECT ADDRESSES – the TARGET PROPERTY** – to additional specific victims, the tracing of those funds is consistent with this fraud ring's pattern of receiving fraud proceeds and then laundering those proceeds through other cryptocurrency addresses. For this reason, your Affiant believes the entire balance of the **TARGET PROPERTY** is comprised of funds obtained by fraud and subject to seizure. In addition, even if the source of some of the funds comprising the **TARGET PROPERTY** cannot be conclusively shown, because they contains illicit funds comingled with other illicit funds as well as unknown funds, and those funds having passed through multiple addresses, your affiant respectfully submits that all funds are involved in money laundering, and therefore subject to seizure.

## CONCLUSION

52.     This affidavit seeks seizure of the equivalent amount of USDT tokens currently associated with the **TARGET PROPERTY**. Based on my training and experience, I know individuals engaged in fraud often move proceeds of criminal activity through multiple financial

addresses, sometimes at a rapid pace, and often with no discernable legitimate purpose with the goal of concealing the true nature and source of the underlying funds. The tracing in this case demonstrates this; it shows the movement of the victims' funds, broken up and distributed through a series of transactions, without any apparent legitimate economic purpose, which implies the purpose of the transactions was to conceal the nature, source, location, ownership and control of the proceeds. *See, e.g., United States v. Rodriguez*, 53 F.3d 1439, 1447-48 (7th Cir. 1995) (convoluted real estate transactions, from which intent to conceal or disguise may be inferred, also imply knowledge of illegal source).

53. Based on the forgoing, I submit that there is probable cause to believe the **TARGET PROPERTY**, in any form, are proceeds of, or traceable to proceeds of wire fraud, in violation of 18 U.S.C. §1343, and/or are involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 28 U.S.C. § 2461(c), and 982(a)(1).

54. Further, because the requested warrants would be executed by electronic service, I respectfully submit that there is good cause to permit the execution of the warrants at any time, day or night.

### Freezing of the TARGET PROPERTY

55. On or about April 16, 2026, Tether voluntarily agreed to freeze the USDT associated with **SUBJECT ADDRESSES 1-7**.

56. On or about April 17, 2026 Tether voluntarily agreed to freeze the USDT associated with **SUBJECT ADDRESS 8**.

57. In total, the TARGET PROPERTY consists of the following amounts of USDT frozen by Tether as a result of the above-described investigation:

| SUBJECT ADDRESS | FROZEN USDT |
|---|---|
| SUBJECT ADDRESS 1 | 19,504 |
| SUBJECT ADDRESS 2 | 40,856.63105 |
| SUBJECT ADDRESS 3 | 42,012.218347 |
| SUBJECT ADDRESS 4 | 8,174.354623 |
| SUBJECT ADDRESS 5 | 29,519.574822 |
| SUBJECT ADDRESS 6 | 20,205.89865 |
| SUBJECT ADDRESS 7 | 25,768.027118 |
| SUBJECT ADDRESS 8 | 11,055.342853 |
| Total Frozen | 197,096.047463 |

## CONCLUSION

58.    Based on information derived from the foregoing investigation, there is probable cause to conclude that the **TARGET PROPERTY is** proceeds of a wire fraud and money laundering scheme performed in violation of 18 U.S.C. §§ 1343, 1349 (wire fraud and conspiracy to commit wire fraud), and 18 U.S.C. § 1956(a)(1)(B)(i), 18 U.S.C. § 1957, and 18 U.S.C. § 1956(h) (money laundering, violation of the spending statute, and conspiracy to commit money laundering).  Those proceeds are subject to forfeiture as proceeds of wire fraud, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 USC § 2461(c) as well as property involved in money laundering offenses, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 18 USC § 982(a)(1). Accordingly, I respectfully request that a warrant be issued authorizing the seizure the equivalent amount of Tether ("USDT") constituting the **TARGET PROPERTY.**

59.    Based on the forgoing, I request that this Court issue the proposed seizure warrant.  Because the warrant will be served on Tether, who will then collect the funds at a time convenient to it and transfer the funds to the government, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

WILLIAM NOVAK
Digitally signed by WILLIAM NOVAK
Date: 2026.05.18 14:54:49 -04'00'

William Novak
Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____21st___ day of May 2026.

The Honorable Ajmel A. Quereshi
United States Magistrate Judge

## ATTACHMENT A: PROPERTY TO BE SEIZED

Pursuant to this warrant, Tether shall provide the law enforcement officer/agency serving this document with the equivalent amount of USDT tokens that are currently associated with the virtual currency address referenced below. Tether shall effectuate this process by (1) burning the USDT tokens currently associated with the virtual currency address referenced below and (2) reissuing the equivalent value of USDT tokens to a U.S. law enforcement-controlled virtual currency wallet. Tether shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate its implementation.

    a. The equivalent amount of USDT tokens ("USDT") as associated with the wallet address identified by:

1. TXfcBgRLR3KSXU3EKx7cqTd1hiQmApZJds
2. TFsoKXzYRSL1rdiQKEr5M3FYCzVKK5VR7N
3. TL7SATJ7dNqZyYCzhCneEfqBENPsSDcd7c
4. TGccjccLh2dkpJy2TpwFH7KbSKe4PyxhTS
5. TD4j3yetUk3tLhnqACgbuGXoQGHngcU2Q3
6. TStxBD56uUSmsJ5jrwoFVDUMN5Kgy8s25t
7. TT7KZZtsBSdcchLW2KnnGLnr9wZAAbc98U
8. TQTVRmLE6KakX2rNe6mt294pL1tCjLVui2